**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO. 1:23-CR-254-GLR** |
| | * | |
| **SUSAN K. PATRICK,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\***

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The defendant, Susan K. Patrick, stole over $2.5 million from the United States. And when she got caught, she doubled down by lying to the Internal Revenue Service and doctoring evidence to cover it up.

For tax years 2012 through 2014, Patrick hired an accounting firm to prepare Forms 1040 (U.S. Individual Income Tax Return) for her and her husband, and Forms 1065 (U.S. Return of Partnership Income) for their media brokerage firm, Patrick Communications, LLC. Each year, the accountants prepared the returns accurately and sent them to Patrick with instructions to file them with the IRS and to pay the required taxes. But Patrick decided not to file the returns. She decided she did not want to pay.

In 2016, the IRS contacted Patrick to inquire about her failure to file tax returns for these years. In response, Patrick lied to the IRS and claimed that her accountants had timely filed all of the required returns. She further promised to send the IRS copies of the returns that had been purportedly filed, telling the IRS Revenue Officer: "I will get you everything you need to close the file."

It was a promise she never intended to keep. Instead, Patrick personally doctored the returns prepared by her accountants to remove $10,000,000 in gross receipts earned by Patrick

Communications and $9,500,000 in income earned by her and her husband. She then added backdated signatures to each of the returns to make it appear as if they had been timely prepared and filed. And her deception initially succeeded: after receiving the doctored returns, the IRS Revenue Officer determined Patrick to be in compliance and closed the collections case. Only after additional government resources were dedicated to a criminal investigation was her fraud discovered.[1]

\* \* \*

Patrick's fraud was not an irrational crime committed in the heat of the moment. Like other white-collar criminals, Patrick made the decision to steal based on a simple calculation: that the pay-off outweighed the risks. That is precisely why the U.S. Sentencing Commission has emphasized that the primary goal of sentencing in tax cases is to achieve general deterrence through imprisonment. *See* U.S.S.G. ch. 2, pt. T, introductory cmt. As the Fourth Circuit has explained:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2011).

In addition to sending a message to would-be tax evaders, the Court's sentence will also send a message to honest, taxpaying citizens who work hard and play by the rules. By demonstrating that tax cheats like Patrick will pay a heavy price for their theft, a sentence in

---

[1]     As discussed below, *infra* Section I.B.4, Patrick also hired her accounting firm to prepare a Form 1065 and Form 1040 for the tax year 2015. She never filed either return. The tax loss from the failure to file the individual return is included in the stipulated tax loss calculation.

line with the Government's recommendation will promote respect for the law and the integrity of the nation's tax system, which is vital to its preservation.

Accordingly, the Government respectfully recommends that the Court sentence Patrick to 24 months' imprisonment, followed by 1 year of supervised release. This sentence is within the Guidelines range and supported by the sentencing factors at 18 U.S.C. § 3553(a).

I.   **Background**

A. **Procedural History**

On August 31, 2023, pursuant to a plea agreement, Patrick pleaded guilty to a one-count Information charging her with Willfully Making and Subscribing a False Tax Return, in violation of 26 U.S.C. §7206(1). Presentence Investigation Report ("PSR") ¶¶ 1-2.

B. **Factual Background**

1. **Patrick's Businesses**

Since 1995, Patrick, along with her husband William Lawrence Patrick, has been the co-owner of Patrick Communications, LLC. Gov't Ex. 1 ¶ 4 (First MOI of Susan Patrick); PSR ¶ 46. Patrick Communications is a media brokerage firm that assists clients with the sale of television stations, radio stations, and broadcast towers. Gov't Ex. 2 ¶ 1 (Second MOI of Susan Patrick). It also provides business valuations and appraisals, as well as expert industry witness testimony for litigation. *Id.* As of May 2018, Patrick Communications had approximately seven employees in addition to the Patricks. *Id.* ¶ 7. The company was previously based in Maryland, but moved to Cody, Wyoming. *See id.* ¶ 3.

The Patricks also own multiple other businesses within the same industry, including Legends Communications of Wyoming, LLC ("LCW"). Gov't Ex. 1 ¶ 17; PSR ¶ 46. As of May 2018, LCW owned approximately 22 radio stations and earned its revenue primarily through

advertising fees. Govt' Ex. 1 ¶ 18. It had approximately 50 employees. *Id.* ¶ 25. Other companies currently or previously owned by the Patricks include Legend Towers, Legend Communications of Ohio, Legend Communications of Missouri, and Target Digital Solutions. Gov't Ex. 3 ¶ 7 (MOI of CW); PSR ¶ 46.

### 2. Patrick's Submission of Doctored Tax Returns to the IRS

Patrick handled tax matters for the Patricks' businesses with the assistance of an employee who helped maintain the businesses' books and records. Gov't Ex. 3 ¶ 14; Gov't Ex. 4 ¶¶ 2, 7 (MOI of GMA). Beginning in 1999, Patrick had employed the accounting firm Gross Mendelsohn & Associates ("GMA") to prepare her businesses' tax returns, as well as her and her husbands' individual tax returns. *See* Gov't Ex. 4 ¶ 5 & n.1. For the tax years 2012 through 2014, Patrick hired GMA to prepare Forms 1040 (U.S. Individual Income Tax Return) for her and her husband, as well as Forms 1065 (U.S. Return of Partnership Income) for Patrick Communications. PSR ¶ 7. GMA prepared accurate returns and sent them to Patrick with instructions to file the returns with the IRS. *Id.* However, Patrick never filed the returns. *Id.*

In approximately June 2016, the IRS opened a collections case related to unpaid employment tax returns for Patrick Communications. *Id.* ¶ 8. During that collections case, the IRS Revenue Officer assigned to the case discovered that no partnership returns had been filed for Patrick Communications and no individual income tax returns had been filed for the Patricks, for 2012 through 2014. *Id.* When the Revenue Officer reached out to Patrick to inquire about the missing returns, Patrick lied: she stated that her accountants had timely filed the returns. *Id.* She then promised to provide copies of the accountant-prepared returns that had

purportedly been filed, telling the Revenue Officer: "I will get you everything you need to close the file." Gov't Ex. 5 at 1.

In August 2016, Patrick mailed the IRS purported copies of the tax returns that had been prepared by GMA. PSR ¶ 9. But these "copies" were not actually the accurate, GMA-prepared returns. Instead, Patrick had taken those accurate returns and personally doctored them to remove $10,000,000 in gross receipts on the Forms 1065, and approximately $9,500,000 in personal income from the Forms 1040. *Id.* For example, on the Forms 1040, Patrick took the GMA-prepared returns—which reported total income ranging from approximately $1.1 million to $4.3 million each year—and changed the numbers so that each year the Forms reported income *losses* ranging from -$35,109 to -$855,947. Gov't Ex. 6. Patrick also removed supporting documentation that had been included by GMA as part of the accurate returns. *See, e.g.*, Gov't Ex. 7.

To make it appear as if these false, doctored returns that Patrick created were in fact copies of the accurate, purportedly timely-filed tax returns that had been prepared by GMA, Patrick also backdated her signature on each of the returns and included GMA's information in the paid-preparer section of the forms. PSR ¶ 9. This deception was most apparent on the fraudulent Form 1065 that Patrick submitted for the tax year 2013. Patrick signed that form and dated it September 15, 2014. Gov't Ex. 8. However, to create that fake return she had used a blank Form 1065 from *2015*—which was not published to the public until December 2015—and she forgot to remove the "2015" label from the bottom right-hand-corner of the signature block (as she had done elsewhere on the form). *Id.*

Patrick's fraudulent scheme initially succeeded. After receiving the fake returns from Patrick, the Revenue Officer reviewed the returns, noted that no tax was due and no refund was owed, and subsequently closed the collections case. Gov't Ex. 5 at 2.

### 3. Patrick's Lies to Law Enforcement Agents

Eventually, the false returns filed by Patrick came under the scrutiny of a criminal investigation. As part of that criminal investigation, the IRS-CI Special Agent and Revenue Agent assigned to the case interviewed Patrick about the returns. At the interview, Patrick again lied multiple times about the fraudulent returns she submitted. First, she repeated the lie that she had timely filed the tax returns that been prepared by GMA each year. Gov't Ex. 2 ¶ 27. Second, when confronted with the fraudulent returns she submitted, she admitted that the "numbers are too low" but falsely explained that these returns were drafts that she had used as a "worksheet" to see what the tax returns would look like if certain income was recognized under a different method of accounting. *Id.* ¶¶ 26, 31-32. And she claimed that these purported "worksheets" were sent to the collections Revenue Officer by mistake—that she had gathered and sent the wrong copies without realizing it. *Id.* ¶ 34, 43. This, too, was a lie.

### 4. Patrick's Willful Failure to File Tax Returns for 2015

Patrick also hired GMA to prepare a Form 1065 for Patrick Communications and a Form 1040 for her and her husband for the tax year 2015. Although GMA accurately prepared the returns and sent them to Patrick to file with the IRS, Patrick never filed the returns. PSR ¶ 10.

### 5. Patrick's Financial Background

Patrick's fraud was not motivated by financial desperation. As reflected by the accurate tax returns, from 2012 through 2015, Patrick and her husband earned over $9 million in total

income. Gov't Ex. 6; Gov't Ex. 9 at 2. In 2013 alone, Patrick and her husband spent over $350,000 purchasing a Tesla, a condominium in Bozeman, MT, and a vacation to the British Virgin Islands. Gov't Ex. 4 ¶ 25. The PSR estimates Patrick's current net worth at approximately $7.5 million. PSR at 8.

## II.   **<u>Applicable Legal Standards</u>**

Sentencing the defendant begins with a properly calculated Guidelines range. *Gall v. United States*, 552 U.S. 38, 48-50 (2007). The applicable Guidelines range and policy statements "seek to embody the [18 U.S.C.] § 3553(a) considerations" and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 348-49 (2007). After calculating the Guidelines range, the sentencing court must consider the resultant sentencing range along with factors listed in 18 U.S.C. § 3553(a) before arriving at the final sentence.

To the extent the Court is called upon to make findings of fact relevant to sentencing, those findings must only satisfy the preponderance of the evidence standard. *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). In making such findings, "a sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010). The Court may also rely on undisputed factual findings set forth in the Presentence Investigation Report. *United States v. Holman*, 354 F. App'x 791, 793-94 (4th Cir. 2009) (per curiam) (citing *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991)).

III.    **Statutory Maximum Penalties**

Patrick pleaded guilty to the single offense charged in the Information.

Count One, Willfully Making and Subscribing a False Tax Return, in violation of 26 U.S.C. § 7206(1), carries a maximum sentence of three years' imprisonment, one year of supervised release, a $250,000 fine (or a fine that is twice the gross gain or loss of the offense), the costs of prosecution, and a $100 special assessment. 26 U.S.C. § 7206; 18 U.S.C. § 3571 (general criminal fine statute); 18 U.S.C. § 3583 (supervised release).[2]

IV.    **Sentencing Guidelines Calculation**

A. **Base Offense Level**

1. **Applicable Guidelines Sections**

Violations of 26 U.S.C. § 7206(1) are governed by Guidelines section 2T1.1. Under that section, the base offense level is calculated by determining the tax loss and selecting the offense level associated with that loss in the Tax Table at section 2T4.1. *Id.* § 2T1.1(a)(1).

Tax loss is defined as "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." *Id.* § 2T1.1(c)(1). The tax loss calculation also includes tax loss resulting from relevant conduct, including uncharged conduct. *United States v. Baucom*, 360 F. App'x 457, 462 (4th Cir. 2010). For tax offenses, the Guidelines define relevant conduct broadly: "In determining the total tax loss attributable to the offense, *all conduct violating the tax laws* should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that

---

[2]    The general criminal fine statute, 18 U.S.C. § 3571, provides for higher maximum fines than those specified in the statute of conviction, unless the statute of conviction specifically exempts the offense from Section 3571's provisions. *See* 18 U.S.C. § 3571(e). Title 26 tax offenses are not exempted, so the higher limits of Section 3571 apply. *See, e.g.*, *United States v. Looney*, No. 04-16064, 2005 WL 2522519, at *8 (11th Cir. 2005).

the conduct is clearly unrelated." U.S.S.G. § 2T1.1 cmt n. 2 (citing *id.* § 1B1.3(a)(2)) (emphasis added). The Government bears the burden of establishing the tax loss by a preponderance of the evidence. *United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010).

### 2. Tax Loss Calculation

In the plea agreement between the parties, the Government and Patrick agreed that the base offense level is 22, because the tax loss was more than $1,500,000 but not more than $3,500,000. Plea Agreement ¶ 6(a), ECF No. 13. More specifically, as described in the attached Statement of Facts, Patrick agreed that she "ultimately evaded payment on an amount of tax due and owing to the United States of at least approximately $2,536,524." *Id.* at 13.

That figure is comprised of the additional tax due and owing for Patrick and her husband as reported on the accurate tax returns prepared by GMA. *See* Gov't Ex. 10; Gov't Ex. 9 at 2.

### B. Adjustment for Acceptance of Responsibility

Based on Patrick's timely acceptance of responsibility, the Government agrees that she is entitled to a two-point reduction in offense levels pursuant to U.S.S.G. § 3E1.1(a) and moves for an additional one-point reduction pursuant to § 3E1.1(b).

### C. Adjustment for Zero-Point Offenders

Effective November 1, 2023, defendants who meet the criteria of U.S.S.G. § 4C1.1, which include, among other requirements, that the defendant did not receive any criminal history points, are entitled to receive a further two-point reduction in their offense level. U.S.S.G. § 4C1.1(a).

The Government does not oppose Patrick receiving a two-point reduction in offense levels pursuant to U.S.S.G. § 4C1.1(a). However, because the Government believes that Patrick's offense is serious, it opposes a departure to a sentence other than imprisonment. *See id.* § 5C1.1 cmt. n.10.

### D.  Total Offense Level

Based upon the foregoing, the Government's recommendation is that Patrick's total offense level is 17. *See also* PSR ¶ 26.

### E.  Criminal History Category

The Government agrees with the recommendation in the PSR that Patrick has a zero-point criminal history score and that her Criminal History Category is I. PSR ¶ 29.

### F.  Final Guidelines Calculation

With a total offense level of 17 and a Criminal History Category of I, Patrick's advisory Guidelines range is **24-30 months' imprisonment**. U.S.S.G. Ch. 5 Pt. A (sentencing table). This places Patrick in Zone D, and the Guidelines recommend incarceration. *Id.*

## V.  Section 3553(a) Sentencing Factors

After calculating the applicable Guidelines range, the sentencing court must then consider "the factors set forth in [18 U.S.C.] § 3553(a)." *Peugh v. United States*, 569 U.S. 530, 536 (2013). Here, consideration of the Section 3553(a) sentencing factors further emphasizes the need for a meaningful sentence within the Guidelines range.

### A.  Patrick's Multi-Million Dollar Fraud Is a Serious Offense

"No one was hurt." "It's a drop in the bucket." "This should have been a civil matter."

Whether expressly stated or not, these are the common refrains that seek to minimize tax crimes as non-serious offenses. But courts and policymakers have repeatedly emphasized that tax fraud *is* serious and that sentencing courts need to treat it accordingly. *See, e.g.*, *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010) ("[T]he policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were

imposed for tax crimes." (citing U.S.S.G. Ch. 1., Pt. A, introductory cmt. 4(d) (1998))); *see also* 18 U.S.C. § 3553(a)(5) (directing sentencing courts to consider applicable policy statements issued by the Sentencing Commission).

Our nation and society depend on the tax system, and that system in turn depends on individuals to voluntarily and honestly report their tax liabilities; as one court has put it, "the Federal tax structure is the ultimate honor system." *Turnham v. C.I.R.*, 979 F.3d 1322, 1323 (11th Cir. 2020); *see also Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting) ("Taxes are what we pay for civilized society . . . ."). Tax fraud undermines the integrity of the tax system, just as lies undermine any system built on trust. And it contributes to a significant, tangible problem: the annual "tax gap"—the difference between what is owed and what is paid nationwide—is projected to be $540 billion, as of the IRS's latest estimate. *See* The Tax Gap, IRS (last accessed November 27, 2023).[3]

Patrick's tax crimes are especially serious. She stole over $2.5 million from the United States. And when the IRS devoted its limited resources to collect the money that she owed, Patrick engaged in repeated lies and deception in an attempt to cover up her crime. To be clear: this is not a case where a misguided individual buried their head in the sand and hoped the IRS wouldn't notice some missing taxes. This is a case of flagrant dishonesty, of shameless disregard for the law.

And what was her reason? While Patrick's fraud would be inexcusable under any circumstance, the evidence shows she was *not* motivated by anything approaching financial

---

[3] Available at https://www.irs.gov/newsroom/the-tax-gap#:~:text=Based%20on%20the%20projections%20for,projected%20to%20be%2085.1%20percent.

desperation. Between 2012 and 2015, Patrick and her husband earned an average of approximately $2.25 million in total income each year. In 2015, the top 1% of households had an average annual income of approximately $1.86 million.[4] There are millions of hardworking Americans who pay their taxes each year despite struggling to make ends meet. Patrick was not one of them.

### B. A Significant Prison Sentence Within the Guidelines Is Necessary to Achieve General Deterrence

Patrick's crime was not a spur-of-the-moment, irrational act. It was the result of a deliberate, rational calculation: that the benefit of the fraud outweighed the risk of getting caught and significantly punished.

For this reason, general deterrence is of paramount importance for white-collar offenses. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)); *see also* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 EMORY L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

---

[4] CONGRESSIONAL BUDGET OFFICE, THE DISTRIBUTION OF HOUSEHOLD INCOME, 2015 (2018), https://www.cbo.gov/system/files/2018-11/54646-Distribution_of_Household_Income_2015_0.pdf

This is especially true of criminal tax cases, where prosecutions are relatively rare. "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying th[e] guidelines." U.S.S.G. ch. 2, pt. T, introductory cmt. Moreover, the Sentencing Commission has made it clear that imprisonment—not other, lesser sanctions—is what creates general deterrence in tax cases. As noted by the Fourth Circuit, "the Commission believes that there must be a real risk of actual incarceration for the Guidelines to have a significant deterrent effect in tax evasion cases." *United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2011). The Fourth Circuit agreed with this approach, explaining:

> [W]e believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*Id.*

Anything less than a significant prison sentence in this case would actively undermine the goal of general deterrence and encourage similar behavior by others. As the Eighth Circuit stated in vacating a non-prison sentence in a $240,000 tax evasion case, "the goal of deterrence rings hollow if a prison sentence is not imposed in this case." *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006); *see also* 18 U.S.C. § 3553(a)(2)(B).

**C.  A Guidelines Sentence Will Avoid Unwarranted Sentencing Disparities**

In addition to achieving the goal of deterrence, a Guidelines sentence in line with the Government's recommendation will help prevent unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). In fashioning the Guidelines for tax offenses, the Sentencing Commission sought not only to achieve consistent sentences for similar tax crimes, but also to eliminate

disparities in sentencing between white-collar offenses and equally serious *non* white-collar offenses. As former Justice Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system more fair, it promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). Simply put, when the public sees a defendant who has committed a serious white-collar offense walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."); *United States v. Muffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing the need for "the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

### D.  Patrick's History and Characteristics Support a Guidelines Sentence

Section 3553(a)(1) also instructs the Court to consider a defendant's history and characteristics in fashioning a reasonable sentence. Unlike many criminal defendants, Patrick's

decision to commit crime does not appear to be mitigated by a significantly disadvantaged background, such as a childhood marred by abuse or a broken family structure. *See* PSR ¶¶ 34-40.

**VI.**   <u>**Restitution**</u>

As part of her plea agreement, Patrick agreed to pay restitution to the IRS in the amount of $2,536,524. Plea Agreement ¶ 10, ECF No. 13. Pursuant to 18 U.S.C. § 3663(a)(3), a sentencing court may order restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). This includes criminal tax cases prosecuted under Title 26. *See United States v. Anderson*, 545 F.3d 1072, 1077-78 (D.C. Cir. 2008). Accordingly, the Government requests that the Court issue a restitution order directing Patrick to pay restitution as set forth in the plea agreement.

In addition, to facilitate the IRS's restitution-based assessment that it is mandated to conduct pursuant to 26 U.S.C. § 6201(a)(4), the Government further requests that the Court include in its restitution order the table located at paragraph 12 of the parties' plea agreement, which is copied here below. *See* Plea Agreement, ¶ 12, ECF No. 13. The table provides a breakdown of the total restitution amount by tax year. Including this table in the restitution order will help the IRS assess the total restitution amount in the appropriate tax years.

| Tax Year(s) | Total Amount of Tax Loss |
|:---:|:---:|
| 2012 | $637,450 |
| 2013 | $1,480,073 |
| 2014 | $267,745 |
| 2015 | $151,256 |
| **TOTAL:** | **$2,536,524** |

15

Patrick has also agreed to pay interest on the restitution amount. *Id.* ¶ 12. The Government will provide an updated interest figure at the time of the sentencing hearing.

**VII.**     <u>**Conclusion**</u>

For the reasons stated herein, the Government recommends sentencing the Defendant to 24 months' imprisonment, followed by 1 year of supervised release.

Respectfully submitted,

David A. Hubbert
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

_____
Matthew L. Cofer
Trial Attorney
Thomas F. Koelbl
Assistant Chief
U.S. Department of Justice, Tax Division

16

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification to counsel of record for the defendant.

Matthew L. Cofer
Trial Attorney